Carita RICHARDSON, et al., Plaintiffs,

v.

RICHARDSON–MERRELL,
INC., Defendant.

Civ. A. No. 83–3505.

United States District Court,
District of Columbia.

Dec. 19, 1986.

Barry Nace, Paulson, Nace & Norwind, Washington, D.C., for plaintiffs.

Mark L. Austrian, Collier, Shannon, Rill & Scott, Washington, D.C., for defendant.

## MEMORANDUM AND ORDER

JACKSON, District Judge.

This products liability case is presently before the Court on defendant's motion for judgment n.o.v. or a new trial following a jury verdict for plaintiffs of $1.16 million after a lengthy trial. It is one of a number of cases filed across the country in which the plaintiffs allege that a child's congenital limb deformities were caused by Bendectin, an anti-nauseant medication manufactured by defendant to be taken orally by the mother during pregnancy to alleviate "morning sickness."

This trial was a virtual reprise of *Oxendine v. Merrell Dow Pharmaceuticals, Inc.*, 506 A.2d 1100 (D.C.1986), the only other such case known to the Court to have been tried to conclusion in a plaintiff's verdict which has survived all post-trial proceedings to date. The trial judge in *Oxendine* set aside the verdict and judgment with only a brief statement of reasons, but the District of Columbia Court of Appeals reversed, in an opinion which, although accurately summarizing the testimony, did not address the significance of certain evidence bearing upon the current state of scientific knowledge. In consequence, it judicially reopened an esoteric twenty-year-old controversy which is by now essentially settled within the scientific community.[1]

■ This Court, having heard substantially the same evidence as the trial judge in *Oxendine*, is of the same opinion as to its efficacy. No reasonable jury could find on the basis thereof that this infant plaintiff's birth defects were more likely than not to have been caused by her intrauterine exposure to Bendectin; alternatively, even if such a finding were reasonable, it is

---

1. The discovery in the early 1960's that the sedative Thalidomide was also a potent teratogen alerted the world to the dangers that attend the medication of expectant mothers, prompting greater scrutiny of all pharmaceuticals by government, the medical profession, and the related sciences. Since analogies between the investigations of Thalidomide and Bendectin would be inevitable throughout the trial of this case, the parties and witnesses were required to employ the euphemism "MRL–41" for Thalidomide to prevent, if possible, an invidious equation of the two.

nevertheless so clearly contrary to the weight of the evidence that the case must be retried. For the reasons hereinafter set forth, therefore, defendant's motion will be granted, and judgment notwithstanding the verdict will be entered for defendant, with a new trial granted in the alternative.

## I.

Carita Richardson, the fourth child of Etheleen and Samuel Richardson, was born in the District of Columbia on February 16, 1976. Her siblings were normal at birth. At her birth Carita had a deformed left arm, with an underdeveloped humerus fused to the radius at the elbow, terminating in a hand with only two digits. Her right arm was normal. The right and left femurs were likewise underdeveloped, and, while her lower left leg was normal, she had no lower right leg at all. An appendage resembling a foot (later amputated) was attached directly to her right hip.

Etheleen Richardson (then aged 38) conceived Carita approximately May 28, 1975. She developed "morning sickness," i.e., the nausea which occasionally occurs in early pregnancy (onset at about 21–28 days *post* conception) and began taking Bendectin, on her doctor's prescription, on or about June 28, 1975, two tablets at night and one in the morning, for at least the duration of the period of organogenesis, when Carita's limbs were forming *in utero* (from about the 24th through the 56th days *post* conception).

In 1975 Bendectin contained 10 mg. each of dicyclomine hydrochloride, doxylamine succinate, and pyridoxine hydrochloride—an anti-cholergenic, antihistamine, and Vitamin B–6, respectively—the latter two ingredients included for their ostensible antinausea and anti-emetic properties.[2]

Bendectin (also known as "Debendox" in the British Commonwealth, and "Lenotan" in West Germany) had been marketed by Merrell-Dow Pharmaceuticals, Inc., or its predecessors, Wm. S. Merrell Co. and Richardson-Merrell, Inc. (hereinafter "Merrell"), as an anti-nauseant since 1956. In the United States it has always been available only by prescription; in some other countries it was sold over-the-counter.

Expert witnesses for both sides generally agreed that congenital birth defects are present in approximately two to four per cent of all live births; that limb reduction defects, specifically, occur at a rate of approximately three per thousand; that genetic or chromosomal abnormalities account for from 10 to about 15 per cent of all birth defects, and maternal illnesses, e.g. diabetes, or viral or bacterial infections, will explain perhaps three to five per cent more; and that there is a large category—a majority—to which no cause can be ascribed with certainty. They are also agreed that "environmental" factors can and do cause some of the remainder, including substances ingested by the mother. Plaintiffs assert that Carita Richardson's afflictions were caused by the Bendectin her mother took in the summer of 1975. Defendant denies it, but, being without evidence to implicate another of the known causes of birth defects, places Carita in the "unknown" category for which science has yet to find an explanation.[3]

Unable to prove directly how Bendectin actually (or could have) affected Carita while in her mother's womb, plaintiffs here proceeded (as did the plaintiff in *Oxendine*) with circumstantial evidence.[4] Through the testimony of experts in several disciplines—pharmacology, embryology, veterinary medicine, and the like—they established the similarity of the chemical structure of doxylamine to that of other

---

**2.** Dicyclomine was dropped from the formulation in November, 1976.

**3.** There is no evidence to suggest that Bendectin is a selective teratogen (other than the fact that the vast majority of Bendectin-exposed infants are normal); that Etheleen or Carita Richardson had a peculiar susceptibility to it or any of

its components; or that the composition of the drug distributed in the District of Columbia differed from that distributed elsewhere.

**4.** There is, of course, no direct evidence of Bendectin's actual physiological effects upon the human fetus. No such experiments have been, or could lawfully or ethically be, conducted.

antihistamines known to be teratogenic in animals. Witnesses described the effects of Bendectin components in solution in *in vitro* experiments upon frog nerve fibers and the mesenchyme cells of mouse limb buds, postulating that other effects might occur in the human intra-uterine environment, when Bendectin is infused *via* the mother, which could inhibit the development of fetal organs. And they criticized the animal experiments conducted by Merrell in 1963 and 1966, suggesting that Merrell's raw data had been misassessed, and the number of tests and dosage levels had been insufficient to dispel doubts about Bendectin's safety. Moreover, when such observations as Merrell had made were properly interpreted, they said, the studies did indicate Bendectin's teratogenic potential in animals which raised suspicions of a similar effect in humans.[5]

Defendant's case consisted, in part, of discipline-by-discipline retorts to plaintiffs' witnesses, supplemented by the testimony of several clinicians with extensive experience in prescribing Bendectin for pregnant women or in treating malformed children, all of whom were certain no connection existed between the medication and the malformations. At least equally well-qualified defense experts asserted that a structural chemical resemblance does not import similar chemical activity; that *in vitro* studies on animal tissues have never been scientifically validated as predictors of physiological effects upon living human beings, and, indeed, are generally regarded as useless for the purpose; and that Merrell's animal tests had been, in fact, both proper-ly conducted and properly interpreted, reflecting precisely the conclusions Merrell had drawn from them. Moreover, they declared, animal studies, too, are of limited usefulness in assessing a drug's teratogenic potential in humans; of some 600 known animal teratogens, only a small fraction of them have been shown to have such an effect upon human embryos. All defense witnesses, as might be expected, were of the opinion that Bendectin is not a human teratogen.

Plaintiffs' principal witness on causation was, as in *Oxendine*, Dr. Alan K. Done, a pediatrician, and until three years ago, a professor of pediatrics, pharmacology, and toxicology at Wayne State University in Detroit.[6] (Tr. 776–1370). Based upon his knowledge of Bendectin's chemical structure, the *in vitro* studies, the animal teratology studies conducted by Merrell (and others), and the "human data" he had reviewed, i.e., epidemiological studies which he found defective, inconclusive, or both, Dr. Done stated that, in his opinion, to a "reasonable degree of medical certainty," Bendectin was not only "capable" of causing birth defects in humans, but that it had, in fact, caused those limb defects with which Carita Richardson had been born.[7]

## II.

It was Dr. Done's testimony in principal part upon which the D.C. Court of Appeals relied in holding the *Oxendine* case to have been a " 'classic battle of the experts . . . in which the jury must decide the victor,' " *Oxendine*, 506 A.2d at 1110, *quoting Fere-*

---

5. Plaintiffs were not permitted to introduce into evidence, nor were their experts allowed to rely upon, so-called "drug experience reports" or "adverse reaction reports," i.e., anecdotal case reports of birth defects observed in the offspring of mothers whose histories included Bendectin usage. The Court made a disputed preliminary finding that such reports are neither exceptions to the hearsay rule nor data reasonably relied upon by experts in the field of making determinations of causality.

6. Since May, 1983, Dr. Done has been a proprietor (or an investor in) and for a time the chief executive officer, of an enterprise known as the Association of Consulting Toxicologists which provides "medicolegal and forensic investigation" services (Tr. 1068).

7. Had the epidemiological studies reported a statistically significant association between Bendectin and limb reduction defects, Dr. Done would have found the causal connection to have been established to a "scientific" certainty as well. As it was, they were unnecessary to his opinion for "medical certainty" purposes. (Tr. 1135–37). The "drug experience reports" were likewise unnecessary to his opinion, although he would have relied upon them if permitted to do so.

*bee v. Chevron Chemical Co.,* 736 F.2d 1529, 1535, (D.C.Cir.), *cert. denied,* 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), and reinstating the jury verdict for plaintiff. Dr. Brian MacMahon, Merrell's principal epidemiologist in *Oxendine,* reviewed the epidemiological literature and explained the discipline's method of statistical analysis, drawing his own conclusions from the several studies at variance with those of Dr. Done. It does not appear from the opinion of the D.C. Court of Appeals, however, whether Dr. MacMahon testified in *Oxendine* to the significance of the literature in its entirety, as distinguished from his own appraisal of the several studies he presented, as did Dr. Raymond Seltser, his counterpart in the instant case.[8]

According to Dr. Seltser, beginning in 1963 (shortly after the Thalidomide tragedy) until as recently as 1985, researchers across the western world have conducted a watch on Bendectin (as well as other substances taken or intended to be taken by pregnant women) for signs of teratogenicity. The results of their studies of Bendectin and its components have been published in scientific journals in the United States, Great Britain, Australia, New Zealand, and the Federal Republic of Germany, and those articles have uniformly reported no statistically significant correlation to have been found between pre-natal exposure to Bendectin and the limb reduction defects it was suspected of causing.

Dr. Seltser concurred, to be sure, in the researchers' assessments of their own data (as Dr. Done did not), but the importance of his testimony (Tr. 2347–2943) lies in his presentation of the totality of the published scientific literature on the subject of Bendectin exposure and the incidence of congenital malformations, which collectively represents the sum of all that can be said to be scientifically "known" of the matter at present. Excepting their own empirical observations, the "literature" is to scientists both the ultimate authority as to and the most respected repository of scientific knowledge. And the literature on Bendectin, individually and in the aggregate, fails to demonstrate Bendectin's teratogenicity to a scientifically acceptable degree of accuracy.[9] In short, Dr. Done, who has neither done studies of his own nor published his criticisms of those of others, testified in contradiction of (or, conversely, is contradicted by) not only Dr. Seltser but the findings of all those researchers who have studied and published in the twenty-odd years since the investigation of Bendectin began.[10]

Dr. Seltser is not alone, moreover, in his judgment as to the current state of knowledge about Bendectin within the scientific community. In September, 1980, the Food and Drug Administration ("FDA") of the U.S. Department of Health and Human

8. Presently Dean of the Graduate School of Public Health, University of Pittsburgh, and from 1957 to 1981 a professor of epidemiology at Johns Hopkins University.

9. Dr. Seltser presented 14 published cohort studies and seven case control studies—all he could find in his search of the literature—in none of which is there to be found a statistically significant increase in the relative risk of any congenital limb malformations associated with Bendectin exposure. (Tr. 2505–2509). Those studies which appeared in peer-reviewed professional journals were admitted into evidence under F.R.E. 803 (24).

10. As she did in *Oxendine,* Dr. Shanna Swann, a biostatistician, also appeared for plaintiffs, in rebuttal, to criticize a single epidemiological study, albeit one of the more august ones, namely the Cordero (1981) case control study conducted under the auspices of the Centers for Disease Control, U.S. Public Health Service, in Atlanta, Georgia. (Defendant's Exhibit E–11). Dr. Swann—who is also unpublished on the subject—found fault with the Cordero study in several particulars, principally in its classification of subjects as exposed or unexposed, and, making her own unilateral re-classifications, found the study to show a statistically significant positive association between Bendectin and limb reduction defects. Whether or not Dr. Swann's reclassifications are accurate, Dr. Seltser readily acknowledged that each of the studies is (as are all such studies) vulnerable to some criticism, and no single study alone would be sufficient to exonerate, or to implicate, Bendectin with certainty. It is in the aggregate that they become conclusive.

Services, the government agency responsible for protecting the public from harmful drugs, convened its Fertility and Maternal Health Drugs Advisory Committee (one of several standing committees the FDA maintains in being) to evaluate the evidence with respect to recurrent rumors of Bendectin-related malformations. The panel was composed of five obstetricians, a biostatistician, a neonatologist, and a "consumer representative," and was assisted by consultant-epidemiologists from the National Institutes of Health and the National Cancer Institute. It was asked by the FDA to answer three questions: whether there is, in fact, an increased incidence of birth defects among Bendectin-exposed infants; whether further animal and epidemiological studies were needed; and whether Bendectin should be withdrawn from the market. The answers, according to the testimony of Dr. David F. Archer, the chairman of the panel, (Tr. 2705–2830), were all in the negative.[11]

Having been furnished the available literature several weeks in advance, the Advisory Committee held two days of hearings in Washington, D.C., September 15–16, 1980, to which the public and numerous scholars, including many of the authors of the published epidemiological studies, were invited. Some 30 witnesses, among them Dr. Done, made presentations, at the conclusion of which the Advisory Committee went into executive session and deliberated upon the evidence before it. Eight of the ten committee members were convinced that there was nothing to implicate Bendectin in an increased incidence of any birth defects whatsoever, and the other two were simply "uncertain" as to two species of malformation not involved here. The Advisory Committee reported accordingly to the FDA, and on October 7, 1980, the FDA announced its agreement with its findings, a position it has not changed in the meantime nor been given reason to do so.

### III.

It is unnecessary to revive debate upon the wisdom of that rule of law which, for purposes of awarding damages in personal injury cases, allows unschooled triers-of-fact, whether judges or juries, to resolve those "complex and refractory causal issues ... at the frontier of current medical and epidemiological inquiry," *Ferebee*, 736 F.2d at 1534, for it is obvious that Bendectin's teratogenicity *vel non* is no longer such an issue. The ominous hypothesis of two decades ago, namely, that Bendectin might be another Thalidomide, has been reduced to the status of a perdurable superstition by the worldwide epidemiological investigations it provoked, surviving mainly by the *post hoc ergo propter hoc* logic which beckons whenever deformed babies are born to women who have taken any suspect substance.

Though Dr. Done might disagree, there is now nearly universal scientific consensus that Bendectin has not been shown to be a teratogen, and, the issue being a scientific one, reasonable jurors could not reject that consensus without indulging in precisely the same speculation and conjecture which the multiple investigations undertook, but failed, to confirm. That Dr. Done remains an unbeliever and was willing to testify to his disbelief "with reasonable medical certainty" does not mandate that this case be left as the jury decided it. Without a genuine basis "in or out of the record," even his expert "theoretical speculations" are insufficient to sustain the plaintiffs' burden of proving, by a preponderance of the evidence, that Bendectin not only causes congenital defects generally, but that, in particular, it caused those limb reduction defects with which Carita Richardson was most unfortunately born. *See Merit Motors v. Chrysler Corp.*, 569 F.2d 666, 673 (D.C.Cir.1977).[12]

---

11. Associate professor of obstetrics and gynecology at the University of Pittsburgh, and a member of the Advisory Committee since 1977.

12. *See also In re "Agent Orange" Product Liability Litigation*, MDL No. 381, 611 F.Supp. 1223 (E.D.N.Y.1985); Huber, *Safety and the Second Best: The Hazards of Public Risk Management in*

**804**

For the foregoing reasons, therefore, it is this 19th day of December, 1986,

ORDERED, that defendant's motions for judgment n.o.v. and for a new trial in the alternative, are granted.

---

*the Courts*, 85 Colum.L.Rev. 277, 332–35 & n. 196 (1985).

