## Rice v. Mandalakas

C.P. of Lancaster County, no. CI-99-12019.

*William A. Atlee Jr.* for plaintiff.
*Linda Porr Sweeney,* for defendants Mandalakas and Cardiac Consultants.
*Cathy A. Wilson,* for defendant St. Joseph Hospital.

ASHWORTH, *J.,* December 16, 2002—Plaintiff brought suit against defendants in a medical malpractice case that was heard by a jury from July 17 through July 27, 2002. After deliberation the jury concluded that defendant Nicholas J. Mandalakas M.D. was not negligent in the treatment of plaintiff, and, consequently, the jury did not award damages against defendant Mandalakas and against defendant St. Joseph Hospital.[1] Plaintiff filed a post-trial motion to set aside the jury's verdict and obtain a new trial.

## I. FACTUAL BACKGROUND

Plaintiff presented to the emergency department at defendant St. Joseph Hospital on November 28, 1997 when he complained of chest pain, nausea and vomiting. Defendant had a prior history of reflux esophagitis. The emergency room physician, Russell Mazda D.O., ordered several studies including chest x-rays and cardiac enzymes. Dr. Mazda also requested an evaluation of plaintiff by Cardiac Consultants P.C.

---

1. Prior to trial, St. Joseph Hospital and plaintiff entered into a stipulation in which plaintiff agreed that his sole claim against St. Joseph's Hospital was for vicarious liability for the alleged negligence of the hospital's agents and ostensible agents.

From the evening of November 28, 1997 until 6 a.m. on November 29, 1997, plaintiff underwent five electrocardiograms (EKGs). Dr. Nicholas Mandalakas of Cardiac Consultants reviewed the strips for the EKGs performed, and the EKGs showed a segment elevation. Dr. Mandalakas had plaintiff undergo a stress echo study on the morning of November 29, 1997, and the results were inconclusive. Dr. Mandalakas discharged plaintiff with instructions to limit his activities and to return as an outpatient for a nuclear stress test on December 5, 1997. Despite instructions to limit physical activity, plaintiff went deer hunting between the time he was discharged and the time he was to return for additional testing.

On December 5, plaintiff did return to St. Joseph Hospital for a stress test and myocardial perfusion study. The stress test was performed by Dr. Johnson of Cardiac Consultants, and Dr. Johnson interpreted the EKG strips obtained during the test as normal. The other portion of the test, read by Dr. Berry, showed an abnormality. At the conclusion of the test, plaintiff was permitted to return home.

The following day, on December 6, 1997, plaintiff again went deer hunting. Later that evening, plaintiff suffered an acute myocardial infarction with acute cardiac and respiratory arrest.

As a result of the cardiac arrest and respiratory failure of December 6, 1997, plaintiff was placed on a ventilator until December 9, 1997. Plaintiff then went to a rehabilitation unit where he stayed until December 19, 1997. Plaintiff continued with rehabilitation until April 13, 1998 with various medical providers. Plaintiff eventually returned to his prior place of employment without a pay reduction.

Plaintiff then filed a complaint alleging medical malpractice on the part of defendants. Plaintiff made several claims in his complaint, most notably the fact that as a result of the cardiac-respiratory arrest, plaintiff suffers from severe cognitive impairment. A claim was also initially brought on behalf of plaintiff's wife, but that cause of action was voluntarily discontinued by plaintiff after a pretrial ruling.

Plaintiff filed an omnibus motion in limine seeking to exclude certain evidence from the trial including, inter alia, evidence of plaintiff's prior alcohol and marijuana abuse and plaintiff's alleged domestic violence and abusive personality. After considering the respective positions of the parties, this court concluded that evidence regarding plaintiff's alcohol and marijuana use was permissible, and that evidence of his alleged aggressive and/or abusive personality was admissible.[2]

The rationale for the ruling was that plaintiff was attempting to argue that the heart attack and its resulting consequences adversely affected Plaintiff's cognitive abilities such as his attention span, his learning skills and his memory. To the extent that plaintiff's lifestyle, independent of any alleged negligence, impacted plaintiff's cognitive abilities because of the use of alcohol and/or marijuana, a jury could view that as relevant

---

2. This court ruled that evidence of plaintiff's domestic violence was inadmissible as long as Mrs. Rice did not maintain an action for loss of consortium. However, if such a claim was maintained, this court intended to permit testimony on the topic as it was relevant to any damages sought under a claim for loss of consortium. In the absence of such a claim, plaintiff's domestic violence was irrelevant to the case. After this ruling, Mrs. Rice voluntarily dropped her claim for loss of consortium.

to the issue of damages. With respect to the aggressive personality, this court held such evidence could be admissible. This court limited its ruling on the point, noting that the evidence of an aggressive personality might only be relevant if plaintiff opened the proverbial door first.

Plaintiff then filed a more specific motion in limine addressing solely the issue of marijuana use. Although this court agreed that the admissibility of marijuana use should be evaluated independently from the admissibility of alcohol use, the motion in limine seeking to exclude plaintiff's marijuana use was denied.

After deliberation, the jury came back with a finding that defendants were not negligent. Consequently, there was no decision rendered on the issue of damages or the apportionment of fault among defendants.

Plaintiff makes three arguments on appeal from the jury's finding: (1) that this court erred by admitting evidence regarding plaintiff's allegedly abusive personality; (2) that this court erred by admitting evidence of plaintiff's marijuana and alcohol use; and (3) that this court erred by failing to hold a hearing to determine whether defendants' evidence regarding alleged marijuana use and its impact on an individual's cognitive ability met the requisite level of certainty. Defendants dispute all of plaintiff's claims on appeal and argue in their post-trial briefs that this court erred by failing to submit the issue of contributory negligence to the jury and by limiting one of defendants' experts in his testimony based on the language contained in the expert's report.

## II. STANDARD OF REVIEW

The purpose of the Pennsylvania Rules of Evidence is to promote the admission of all relevant evidence unless there is a specifically enumerated rule barring its introduction. *Valentine v. Acme Markets Inc.,* 455 Pa. Super. 256, 261, 687 A.2d 1157, 1160 (1997); see Pa.R.E. 402 and explanatory note (providing that relevant evidence is generally admissible). Evidence is relevant when it has a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Pa.R.E. 401.

It is a fundamental tenet of Pennsylvania jurisprudence that a trial court has wide discretion in ruling on the relevancy of evidence. *Dunkle v. West Penn Power Co.,* 400 Pa. Super. 334, 583 A.2d 814 (1990) (subsequent history omitted). A trial court ruling on the admissibility of evidence will not be reversed absent an abuse of discretion or an error of law. *Id.*

Furthermore, with respect to analyzing a request for a new trial, the so-called "harmless error" rule applies. In order for a new trial to be granted, an evidentiary ruling must not only be erroneous, but it must also be harmful. *Valentine v. Acme Markets Inc.,* 455 Pa. Super. 256, 687 A.2d 1157 (1997). Merely because an irregularity occurred in the trial or another trial judge would have ruled differently does not suffice to meet the threshold; rather, it is incumbent upon the moving party to demonstrate that he or she suffered prejudice from the mistake by the trial court. *Harman ex rel. Harman v. Borah,* 562 Pa. 455, 756 A.2d 1116 (2000).

## III. LEGAL ANALYSIS

In a global response to all of plaintiff's issues raised on appeal, defendants first argue that plaintiff fails to make any argument that goes to the issue of the culpability of defendants. Instead, plaintiff's arguments focus on the issue of damages, something irrelevant when a jury returns a verdict of no negligence. Defendants cite *Hart v. W.H. Stewart Inc.,* 523 Pa. 13, 564 A.2d 1250 (1989) in support of their argument and quote the following passage: "an erroneous evidentiary ruling on damages, in a case where the jury has found for the defendant on the liability issue, is harmless and does not entitle the plaintiff to a new trial." *Id.* at 16, 564 A.2d at 1250. (citations omitted)

In *Hart,* a witness testified that the plaintiff received workers' compensation benefits as a result of an injury. At trial, the plaintiff called a witness as a representative of his employer and the witness testified, over objection, that the employee received workers' compensation benefits. The jury found in favor of the manufacturer on the liability issue. On appeal, the Superior Court reversed the decision and granted a new trial on the grounds the testimony elicited was in violation of the collateral source rule. The Supreme Court reversed the Superior Court's finding on the grounds that because the employee failed to assign error to any issues as to the jury's finding on the issue of liability, any legal error as to damages was harmless. Defendant St. Joseph Hospital quotes the following passage:

"[The employee] makes no assertion of legal error by the trial court regarding any issue of liability. He does not claim that at trial he presented sufficient facts to jus-

tify a finding of liability in his favor. Instead, [the employee] relies on the claim that the cross-examination of his witness should not have been permitted, maintaining that this error was the crucial factor in the jury's verdict against him. . . . [The employee] overlooks the obvious fact that because he is not challenging the jury's finding that no liability existed, the assertion of prejudice by the introduction of the challenged evidence is irrelevant. To constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining." *Id.* at 16, 564 A.2d at 1252. The Pennsylvania Supreme Court succinctly summarizes the issue by stating "[b]efore the issue of damages is relevant, the jury must determine the question of liability." *Id.* at 17, 564 A.2d at 1252.

The plaintiff in *Hart* argued that although the collateral source issue primarily related to damages, the admission of the evidence prejudiced the trial and was so pervasive as to cause the jury to reach a different conclusion with respect to the issue of liability. *Id.* at 16, 564 A.2d at 1252. The Pennsylvania Supreme Court found such an argument unavailing while noting that "[t]he magnitude of the injury sustained may never be permitted to overcome a plaintiff's failure to establish a defendant's liability." *Id.* at 17, 564 A.2d at 1252.

In this case, plaintiff assigns error to this court's decisions regarding the evidence of plaintiff's personality, plaintiff's marijuana use, and this court's failure to hold a hearing to determine whether defendants' evidence regarding plaintiff's marijuana use and its impact on plaintiff's faculties met the requisite level of certainty under the Pennsylvania Rules of Evidence. Each of these

allegations relate to the proper measure of damages in this case—they do not address the threshold question of liability. None of plaintiff's allegations address the treatment provided by either Dr. Mandalakas or St. Joseph's Hospital. Without a finding that either defendant was legally responsible for plaintiff's injuries, any testimony about his activities is irrelevant. Although some factual distinctions exist, *Hart* is dispositive to the issues raised on appeal before this court. Without a finding of liability, plaintiff's claims on appeal are meritless.[3]

Assuming, for the sake of argument, that plaintiff's claims do go to the issue of negligence, rather than merely damages, they will each be addressed in turn. Plaintiff first argues on appeal that this court abused its discretion by permitting defendants to cross-examine plaintiff's witnesses on the issue of plaintiff's personality, specifically his aggressive and abusive behavior (referred to generically as "plaintiff's personality"). It is worth noting initially that in civil cases evidence of the character or personality generally of the parties is not admissible except when character or personality is directly at issue. See Pa.R.E. 404-405.

Plaintiff argues that his personality was not an issue in the case as the case "involved a claim of medical neg-

3. Moreover, after the close of evidence, this court refused to charge the jury on the issue of comparative negligence. Consequently, even if it was error for this court to permit such testimony, the jury was not given a charge that suggested it could consider plaintiff's personality or marijuana use when deliberating on the issue of liability. Therefore, even if there was some prejudice that enured to plaintiff from this testimony, the fact that this court elected not to charge on the issue of comparative negligence meant that the mistake merely was harmless error.

ligence which resulted in brain damage." Plaintiff's brief in support of post-trial relief, p. 7. Plaintiff asserts that his character was never at issue and that defendants' references to plaintiff's personality during the trial "besmirched Mr. Rice and unfairly prejudiced his case." *Id.*

Both defendants dispute plaintiff's contentions and proffer two specific contrary arguments: first, defendants argue the issue has been waived; secondly, defendants argue that plaintiff's own witnesses opened the door to testimony regarding plaintiff's personality.

This court finds that defendants' waiver argument as to the issue of alcohol use and abusiveness unpersuasive. Plaintiff specifically reserved the right in his initial post-trial brief to challenge the evidence pertaining to plaintiff's alcohol use in footnote 10 of its brief in support of plaintiff's motion for post-trial relief. *Id.* at p. 5 n. 10 (asserting that "plaintiff also contends the court erred by allowing evidence of alcohol use; however, plaintiff will focus this brief on the issue of marijuana use due to the fact that the evidence regarding marijuana use was far more prejudicial than alcohol use evidence"). In light of that specific language in plaintiff's brief and the motions filed by plaintiff's counsel pretrial, this court does not believe those objections were waived. See *Miller v. Peter J. Schmitt & Co. Inc.,* 405 Pa. Super. 502, 512, 592 A.2d 1324, 1329 (1991) (subsequent history omitted) ("Where a motion in limine has been argued and denied before trial, it is unnecessary for the movant's counsel to renew his or her objection during trial.").

Defendants' second contention is that the evidence of plaintiff's alcohol and marijuana use is otherwise admissible because plaintiff placed his personality at issue, and

this court agrees with such an assertion. As noted in Dr. Mandalakas' brief, plaintiff's witnesses in this case referenced, not infrequently, plaintiff's "personality change" after the injury. Plaintiff's witnesses also testified generally about how this change impacted his long-range work prospects. Plaintiff cannot open the door to such testimony on direct examination and then prohibit defendants from addressing the issue on cross-examination.

Dr. Michael Alexander, plaintiff's neurology expert, testified about Mrs. Rice's observations of a personality change, and also his impressions of plaintiff. (Notes of Testimony, pp. 225-28.) As plaintiff suggests in his reply brief, there is some ambiguity as to the proper interpretation of "personality change" in this context. Plaintiff argues "evidence regarding a plaintiff's cognitive function and the job related skills, which was the only 'personality' evidence offered by plaintiff, does not refer at all to 'personality' evidence regarding peacefulness or lack thereof." (Plaintiff's reply brief, p. 3.)

However, plaintiff did explicitly differentiate between cognitive function and "personality change" during direct examination when the following exchange took place with Dr. Michael Alexander, plaintiff's neurology expert:

"Q: The matter of personality change, you talked to us about memory, you talked to us about executive function.

"A: Uh-huh.

"Q: The matter of personality change, now, this is something a little different?

"A: Yes. It's a little different. During my interview with Mr. Rice, I would push him about things that might

concern him or worry him. And by and large, he didn't have any particular concerns . . . severe apathy, lack of interest, lack of motivation or intent, is a kind of personality change which can follow some brain injury." (N.T., pp. 226-27.)

Thus, it is safe to say plaintiff's evidence of personality change was not solely related to executive function[4] but also plaintiff's overall approach to life generally, and more relevantly to this case, plaintiff's overall approach to employment.

The crux of Dr. Alexander's testimony was that the injury suffered by plaintiff was such that it substantially impaired all aspects of his cognitive functioning. Dr. Alexander then reviewed plaintiff's employment performance evaluations, both before and after the injury. After reviewing the evaluations, Dr. Alexander concluded that plaintiff's cognitive functioning, pre-injury, was good. (*Id.* at p. 299.)

Evidence of plaintiff's personality is relevant given the subsequent testimony of plaintiff's supervisor, Logan Harr. Mr. Harr testified at length about plaintiff's performance on the job and his abilities before and after the injury. Mr. Harr read to the jury a performance evaluation in which he stated that he "saw a potential for more responsibility in the future" (N.T., p. 319), but one of plaintiff's weaknesses, comparably speaking, was his communications skills. (*Id.* at p. 318.)

On cross-examination of Mr. Harr, counsel for Dr. Mandalakas explored plaintiff's work history and poten-

---

4. Executive function in this context addressed plaintiff's intellectual capabilities and how those capabilities related to his employment.

tial for further promotion by delving into his prior work-related behavior which included instances of alleged abuse by his fellow employees. (*Id.* at p. 340.) Mr. Harr admitted that plaintiff, as a supervisor, had problems with handling his employees and Mr. Harr agreed when asked if "Mr. Rice's interpersonal skills may very well have been a deterrent to him moving up any further than where he was in 1997 [before the injury]." (*Id.* at p. 342.) There was also testimony elicited which asserted that plaintiff "had difficulty controlling his emotions" (*id.* at p. 343) which undoubtedly affected his ability to progress in the company.

Additionally, plaintiff's wife testified that plaintiff was docile and generally emotionally "flat" or reserved since the injury. The testimony was given, presumably, to establish the extent and nature of plaintiff's injuries, and it was consistent with the prior testimony of Dr. Alexander and Mr. Harr.

The testimony of Dr. Alexander, Mr. Harr and Mrs. Rice, when read in its totality, fairly opened the door for defendants to cross-examine those witnesses as to plaintiff's personality traits. Plaintiff's personality, both before and after the injury, was relevant to assessing his future career earnings as well as any damages for loss of the pleasures of life.

The second issue which plaintiff raises on appeal is that this court erred by permitting defendants to introduce evidence of plaintiff's prior marijuana and alcohol use. Plaintiff's basic theory of the case is that the negligence of defendants caused him to have a heart attack leading to cognitive defects. The evidence of the marijuana and alcohol use was permitted by this court be-

cause such evidence was relevant to the issue of plaintiff's cognitive dysfunction and plaintiff's damages.

It is worth reiterating that this court believes this issue is irrelevant given the jury's finding of no negligence in this instance. The admission of plaintiff's drug and alcohol use only goes to damages, and it is the belief of this court that even if the evidence was improperly permitted, its admission was harmless error.

Assuming, arguendo, that such evidence was relevant to the finding of negligence, this court still believes its admission was proper as it was relevant to the ultimate determination of damages. Both sides reference *Krause v. Taylor*, 710 A.2d 1142 (Pa. Super. 1998) (subsequent history omitted) in their respective briefs. *Krause* was a case in which the Superior Court noted that a plaintiff's prior drug use was admissible because it went to the issue of life expectancy in the case.

Although admittedly plaintiff's life expectancy is not at issue here, *Krause* stands for a more general proposition: namely, that evidence of drug and alcohol abuse are admissible in cases in which that evidence tends to establish a material fact. *Id.* at 1144. Several witnesses before this court testified that plaintiff's drug and alcohol use may have played a role in plaintiff's cognitive difficulties. For example, Dr. Alexander testified during cross-examination that alcohol has the "capacity" to damage the brain (N.T., p. 277), and, with specific reference to plaintiff, Dr. Alexander stated that although he did not believe alcohol played a role "there could be some modest amount" of influence on his cognitive difficulties. (*Id.* at p. 286.)

As for the issue of plaintiff's marijuana use, plaintiff argues that such evidence should have been inadmissible. This court, in its pretrial ruling, noted that evidence of marijuana use could be used to the extent it was related to plaintiff's cognitive deficiencies and hence damages. For the reasons previously articulated with respect to plaintiff's alcohol use, this court believes plaintiff's prior marijuana use was admissible under *Kraus* because it impacts, potentially, the damage assessment in plaintiff's claims for future earnings and life care expenses. In this case, plaintiff's prior alcohol and drug history may—if believed by the jury—have mitigated a damage award.

Plaintiff's third, and final, argument is that there was no scientific evidence which established to the requisite level of medical certainty that marijuana use does in fact have a long-term effect on an individual's cognitive abilities. Plaintiff argues that any testimony about marijuana use is scientific in nature and therefore must meet the *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923) general acceptance standard. *Blum v. Merrell Dow Pharmaceuticals Inc.,* 563 Pa. 3, 764 A.2d 1 (2000).

The gravamen of plaintiff's appeal on this issue is that the testimony given by defendant's expert, Dr. Peter Badgio, was not sufficient to reach the level of certainty required for scientific evidence under *Frye.* In pertinent part, Dr. Badgio's testimony was as follows:

"Q: Now, there has been some evidence here concerning a decade long history of the abuse of marijuana.

"A: Uh-huh.

"Q: And I would ask you . . . [w]hat effect, if any, does chronic, long-term use of marijuana have on cognitive functioning?

"A: Let me first say that there is much less research on chronic marijuana use and neuropsychological functioning than there is on chronic alcohol use. Alcohol use has much more widely studied by neuropsychologists. It's a much larger population of individuals suffering. The— the research data on marijuana use is somewhat varied. The studies evaluate somewhat different populations; people have only used a lot of marijuana for a short time, or people have used a little marijuana over a long time. And there's quite a bit of variation. The overall consensus at this point in time, if we're looking at chronic marijuana use, is that it does impair brain function, and that impairment doesn't go away when you stop the use. It improves, but there is more likely to be long-term residual effects from chronic marijuana use, and by chronic, I mean 10-plus years.

"Q: All right. Does it make any difference the length of time the person has been using marijuana?

"A: Oh, absolutely . . . It's in the chronic cases, as I say, 10 years plus, where there have been studies showing residual effects." (N.T. at pp. 618-20.)

There are really two distinct inquiries raised in plaintiff's post-trial motion on this issue: whether Dr. Badgio's testimony met the "general acceptance" of the scientific community standard under *Frye* and whether Dr. Badgio met whatever standard applies to a medical expert called by the defense.

With respect to the *Frye* issue, general acceptance in the scientific community is required for the admission of expert testimony. In order to be considered reliable, the expert's opinion must be "grounded in the methods and procedures of science, based on more than subjec-

tive belief or unsupported speculation." *Blum, supra,* 564 Pa. at 6, 764 A.2d at 3. Although there are some equivocal aspects of Dr. Badgio's testimony, he definitively concluded that "[t]he overall consensus at this point in time, if we are looking at chronic marijuana use, is that it does impair brain function, and that impairment doesn't go away when you stop the use." (N.T. at pp. 619-20.) Dr. Badgio did not use the talismanic words "general acceptance," but the phrase "overall consensus" suffices to constitute general acceptance under *Frye.* Defendant Mandalakas provided, in response to plaintiff's motion in limine on the issue, the literature upon which Dr. Badgio's conclusion was based both to plaintiff's counsel and to this court pretrial. The literature provided, as well as the testimony proffered, suffices to ensure that Dr. Badgio's testimony is not "junk science" and there-fore meets the *Frye* threshold.

Plaintiff also argues that his treating physician, Dr. Michael Lupinacci, testified in his deposition that "there's not evidence that indicates one way or the other" whether chronic drug use impacts one's cognitive abilities. Plaintiff's brief in support, p. 10. Plaintiff asserts that this testimony, coupled with Dr. Badgio's admission that the research on marijuana use is "varied," suggests that this court should have conducted a *Frye* hearing. This argument by plaintiff is misplaced. There is a substantial difference between a *Frye* determination by the court and a fact-finder's analysis of conflicting expert opinions. It is not the function of this court to weigh conflicting expert testimony; rather, that is a function of the jury. In light of the studies provided to this court prior to trial and the subsequent testimony given at trial, this court

believes that plaintiff's request for a *Frye* hearing was appropriately denied.

Plaintiff also attacks Dr. Badgio's testimony on an alternative basis, namely that Dr. Badgio failed to testify to a reasonable degree of medical certainty. However, as properly noted by defendants, the so-called certainty requirement only applies to parties with the burden of proof. *Neal by Neal v. Lu*, 365 Pa. Super. 464, 530 A.2d 103 (1987). As noted in *Neal:*

"Absent an affirmative defense or a counterclaim, the defendant's case is usually nothing more than an attempt to rebut or discredit the plaintiff's case. Evidence that rebuts or discredits is not necessarily proof. It simply vitiates the effect of opposing evidence. Expert opinion evidence . . . certainly affords an effective means of rebutting contrary expert opinion evidence, even if the expert rebuttal evidence would not qualify as proof." *Id.* at 476, 530 A.2d at 109-110.

Given this standard, Dr. Badgio's evidence was appropriately admitted as his testimony was an attempt to vitiate the testimony proffered by plaintiff.[5]

Defendants have made several cross-motions for post-trial relief as well. Inasmuch as the request by defendants explicitly asks the court only to consider these issues in the event this court grants plaintiff's motion for post-trial relief, this court will refrain from addressing those issues unless they otherwise become relevant.

Accordingly, plaintiff's motion for post-trial relief is denied and I enter the following order:

---

5. Also worth noting is the fact that the admission or rejection of rebuttal evidence is within the sound discretion of the trial judge. *Neal by Neal v. Lu*, 365 Pa. Super. 464, 530 A.2d 103 (1987).

## ORDER

And now, December 16, 2002, for the reasons stated in the foregoing opinion, plaintiff's motion for post-trial relief is denied.